IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| SMITHVILLE 169, LLC, et al., ) | |
| ) | |
| Plaintiffs/Counterclaim Defendants, ) | |
| ) | |
| v. ) | No. 4:11-CV-0872-DGK |
| ) | |
| CITIZENS BANK & TRUST COMPANY, ) | |
| ) | |
| Defendant/Counterclaim Plaintiff. ) | |

## ORDER GRANTING DEFENDANT SUMMARY JUDGMENT ON COUNTERCLAIMS

This case arises out of a loan Defendant Citizens Bank & Trust Company ("the Bank") made to Plaintiff Smithville 169, LLC ("Smithville 169") which the other Plaintiffs guaranteed. The Bank alleges Smithville 169 and the guarantors are in breach of contract because they failed to pay off the loan when it became due. Smithville 169 and the guarantors allege the Bank breached the loan agreements first, committed a variety of economic torts, and violated the federal Equal Credit Opportunity Act ("ECOA").

Now before the Court are the Bank's motion for summary judgment on its counterclaims (Doc. 121) and Plaintiffs' motion for summary judgment on Counts I and III of their Petition (Doc. 113). Because there are no disputed questions of material fact with respect to the Bank's counterclaims, Plaintiffs' affirmative defenses to these counterclaims, or Counts I and III of Plaintiffs' Petition, and the Bank is entitled to summary judgment as a matter of law on these claims, Defendant's motion (Doc. 121) is GRANTED and Plaintiffs' motion (Doc. 113) is DENIED.[1]

---

[1] Plaintiffs have also requested oral argument on the motion. Finding that oral argument would not assist the Court, the request is denied. In ruling on the motions, the Court has carefully considered the parties' briefs, Docs. 114,

## Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party, and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991) (citation omitted). But the "facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (internal quotation marks omitted). "The nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). Additionally, a party seeking to defeat a summary judgment motion by asserting an affirmative defense has the burden of demonstrating the existence of material facts which support the affirmative defense. *See* Fed. R. Civ. P. 56(e); *United States v. Farmers Coop. Co.*, 708 F.2d 352, 352 (8th Cir. 1983).

---

123, 136, 139, 142, and 143; briefing on related issues contained in Docs. 128, 132, 138, and 147; and all exhibits and arguments referenced in these briefs.

**Factual Background**

For purposes of resolving the pending motion, the Court finds the relevant, uncontroverted material facts to be as follows.[2]

Defendant/Counterclaim Plaintiff Citizens Bank & Trust Company ("the Bank") is a Missouri banking corporation located in Chillicothe, Missouri. Plaintiff/Counterclaim Defendant Smithville 169 is a Missouri limited liability company. Plaintiff/Counterclaim Defendant Nelson & Nelson Dev. Co. ("Nelson & Nelson") is a Missouri corporation. Plaintiff/Counterclaim Defendants Jerry D. Nelson and Beverly J. Nelson were husband and wife.[3] Jerry Nelson is President of Nelson & Nelson, and Beverly Nelson was Vice President and Secretary. Plaintiff/Counterclaim Defendants Michael S. Hales and Marlene S. Hales (collectively "the Haleses") are husband and wife and Kansas residents. Plaintiff/Counterclaim Defendant Hales Family Limited Partnership #6 ("HFLP") is a Kansas limited partnership.

On or about February 28, 2007, the Bank and Smithville 169 executed a Construction Loan Agreement ("the Loan Agreement") whereby the Bank agreed to loan up to $7,950,000 to Smithville 169 to commercially develop a piece of property located North of Missouri Highway 92 and West of U.S. Highway 169 in Smithville, Missouri ("the Project"). In relevant part, the Loan Agreement states that:

> A. Borrower desires to acquire certain tracts of land in Smithville, Clay County, Missouri (the "Property") described on Exhibit A, attached hereto and made a part hereof, and to commence the development of a retail center known as Smithville Crossing on the Property (overall the "Project"), to pay for previous and future expenses in acquiring and developing the property and interest accruing on Borrower's obligations to Lender, and to finance the cost thereof by borrowing *a sum not to exceed* Seven Million, Nine Hundred and Fifty Thousand

---

[2] The Court has omitted proposed facts not submitted in conformance with Local Rule 56.1 or that are not supported by the record.
[3] Beverly J. Nelson passed away on September 9, 2012.

and No/100 Dollar ($7,950,000,00) from Lender, such financing to be for the term and upon the covenants, conditions and agreements set out herein ("Loan"); and

B. Lender is willing to lend to Borrower said sums, subject to and upon the terms, conditions and provisions of this Construction Loan Agreement ("Agreement") . . .

The loan covered the cost of land acquisition, mass grading, developed pad sites, entrance, and included interest and miscellaneous money to carry the project through this phase of development. The loan did not include utilities, roads, signal lights, or vertical buildings. The maximum loan amount of $7.95 million was adequate to have the pad sites available to sell and deliver.

With respect to loan disbursement, Article II of the Loan Agreement, states the following:

2.2 Loan Disbursements.

A. Requests. Disbursements of the Loan need not be made more often than once every month and need not be made until after five (5) business days from receipt by Lender of a request for disbursement, *after which Lender shall disburse requested funds, provided the request shall be in substantially the form of Exhibit B, attached hereto and made a part hereof, and shall be in accordance with such procedures and accompanied by such supporting documentation, as Lender shall reasonably require. . . Lender shall have the right to refuse, or discontinue disbursement of the Loan monies at any time or from time to time*, if (i) Borrower or any Guarantor defaults in its agreements hereunder or under any of the Loan Documents, or (ii) Borrower's or any Guarantor's representations or warranties hereunder or under any of the Loan Documents are determined to be, or become, not true; or (iii) any other event of default occurs with respect to Borrower's or any Guarantor's obligations hereunder or under the Loan Documents. If Borrower or any Guarantor should elect pursuant to the provisions of R.S.Mo. § 443.055.7 as amended to terminate the operation of any of the Loan Documents, as defined below, as security for future advances or future obligations after notice to Lender as provided in said statute, Lender shall not be required to make any additional advances to Borrower or to perform any

additional obligations for Borrower under any of the Loan Documents.

In exchange for the Loan, on or about February 28, 2007, Smithville 169 executed and delivered to the Bank a Promissory Note (the "Note") in the amount of $7,950,000, with an original maturity date of March 1, 2010. In relevant part, the Note states:

> FOR VALUE RECEIVED, the undersigned, SMITHVILLE 169, LLC, a Missouri limited liability company ("Borrower") hereby promises to pay to the order of CITIZENS BANK AND TRUST COMPANY . . . the principal sum of Seven Million, Nine Hundred and Fifty Thousand and No/100 Dollars ($7,950,000.00), *or such amount as is advanced hereunder from time to time*, together with interest, subject to adjustment daily, on the unpaid balance thereof, from time to time outstanding until paid in full at the rates hereinafter provided (the "Loan").

On February 28, 2007, Jerry Nelson, Beverly Nelson, Nelson & Nelson, Mike Hales, Marlene Hales, and HFLP (collectively "the Guarantors") executed guaranty agreements (individually "the Nelson Guaranty" and "the Hales Guaranty," collectively the "Guaranties"), which guaranteed repayment of the Loan. At the time, Plaintiffs were represented by an attorney who reviewed and negotiated the loan documents on behalf of all the Plaintiffs.

**1. Loan disbursement history.**

Between March 2007 and April 2011, the Smithville 169 parties submitted approximately 50 requests for disbursement of loan proceeds. These 50 draw requests were not set forth in the letter format attached to the Loan Agreement as Exhibit B, but all were accompanied by an American Institute of Architects ("AIA") document form. The Bank funded all 50 requests. The Bank had concerns about the format or the documentation accompanying a few of the requests and sought a detailed scope of work and estimated cost to complete the remaining work by AIA

document line item. After Smithville 169 provided the additional information, these requests were granted.[4]

Neither the Note nor the Loan Agreement contained a loan-to-value covenant or other provision under which the Bank reserved the right not to disburse the loan if the Note fell below a certain loan-to-value ratio.

The Bank made loan disbursements totaling $7,302,549.19 before the loan matured on May 31, 2011.

## 2. The Bank's response to regulatory scrutiny concerning its real estate loans.

Beginning in the last quarter of 2007, state and federal bank regulators began scrutinizing the Bank's concentration of real estate loans. The Bank subsequently began trying to reduce its exposure to real estate development and construction loans by 20-30% and its commercial real estate loan portfolio by $25 million. To reduce its portfolio of real estate loans in 2007 and 2008, the Bank adopted a strategy of asking borrowers to look for alternative financing when their loans matured. The Bank used foreclosure only as a last resort.

On April 18, 2010, the Bank entered into a consent order with the FDIC. Under the terms of the order, the Bank was given 90 days to develop and complete a written plan to reduce the Bank's risk exposure to loans classified as "substandard" or "doubtful" in the FDIC's November 30, 2009 Report of Examination.

---

[4] Plaintiffs contend that the Bank refused to make a loan disbursement on December 3, 2010, when Jerry Nelson faxed to the Bank what Plaintiffs claim is a request to disburse additional loan proceeds. This fax is a miscellaneous collection of unrelated documents captioned "Jerry's Engineering and Estimates Only, December 3, 2010" "Citizens Bank Loan Renewal, Budget for Below Listed Items," "Citizens Bank Loan Renewal Thoughts," "AIA Application and Certificate for Payment" dated February 15, 2010, and a cover page indicating the fax was sent February 24, 2010. It is unclear what this collection of documents is, but it is unlike any loan disbursement requests in the record. What is clear is that the document was not faxed December 3, 2010 as Plaintiffs claim.

Plaintiffs contend the requested money was needed to extend temporary utilities to the project and finish pad sites so that the sites could be leased or sold to developers. There is no evidence in the record, however, that the request was made before the Loan went into default, or that the Bank had ever agreed to fund draw requests for temporary utilities.

Accordingly, the Court holds Plaintiffs have not demonstrated that there is a disputed question of fact concerning whether the Bank ever refused to grant a loan disbursement request.

The Smithville 169 loan was initially rated as a "pass;" was downgraded on January 14, 2011 to a "watch;" and then was downgraded to a rating of "substandard" on May 31, 2011. It continues to be rated as "substandard."[5]

### 3. The Note's maturity date is repeatedly extended.

The parties modified the Loan documents in writing five times by extending the maturity date of the Note. The last modification occurred on April 28, 2011 when the parties extended the maturity date of the Note from March 31, 2011 to May 31, 2011. The maturity date was not renewed, extended, or modified after May 31, 2011. The loan was not rated "substandard" until just before its final maturity.

Plaintiffs did not make any payments on the Loan Agreement after May 31, 2011, and Smithville 169 did not pay the outstanding loan balance on the Note by the May 31, 2011 maturity date.

The Bank declared a default under the Note and made demand on Smithville 169 and the Guarantors before filing this action. No payments have been made. As of August 1, 2011, the outstanding loan balance on the Note was $7,302,558.00 for principal, $67,526.36 for accrued interest, $365,127.92 for late charges, and $61,868.89 in default interest, all of which totals $7,797,081.17.

### Discussion

## I. The elements of the Bank's counterclaims are satisfied.

### A. The elements for breach of promissory note (Counterclaim I) are satisfied.

The elements for breach of promissory note are: (1) the existence of a valid promissory note signed by the maker; (2) a balance due on the note; and (3) a demand on the maker for payment which has been refused, leaving the maker in default. *Bus. Bank of St. Louis v. Appolo*

---

[5] The only ratings lower than "substandard" are "doubtful" and "loss."

*Invs., Inc.,* 366 S.W.3d 76, 80 (Mo. Ct. App. 2012). In the present case, it is uncontroverted that Smithville 169 executed a valid promissory note; the loan has matured and no payments have been made, leaving an outstanding principal balance due of $7,302,558.00; and that Smithville 169 and the Guarantors have refused to make any payments on this debt. Consequently, unless Plaintiffs have a viable affirmative defense, the Bank is entitled to summary judgment on Counterclaim Count I.

**B. The elements for breach of guaranty (Counterclaim II) are satisfied.**

To recover on a personal guaranty, a creditor must show: (1) that the guarantor executed the guaranty; (2) that the guarantor unconditionally delivered the guaranty to the creditor; (3) that the creditor, in reliance on the guaranty, thereafter extended credit to the debtor; and (4) that the debtor currently owes a sum of money to the creditor that the guaranty purports to cover. *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.,* 854 S.W.2d 371, 382 (Mo. banc 1993). Here, it is uncontroverted that the Guarantors executed the Guaranties; the Guaranties were unconditionally delivered to the Bank; the Bank, relying on the Guaranties, loaned Smithville 169 $7,302,558.00; and Smithville 169 owes the Bank money that the Guaranties purport to cover. Therefore, summary judgment in favor of the Bank and against the Guarantors on Counterclaim is appropriate unless Plaintiffs can assert a valid affirmative defense.

**II.  Plaintiffs' affirmative defenses do not defeat the Bank's claims.**

Plaintiffs have asserted 36 affirmative defenses. In companion orders to this one, the Court granted the Bank summary judgment on 27 of these defenses. The Court held Missouri's Credit Agreement Statute of Frauds barred 26 of these defenses,[6] and that Plaintiff the Estate of Beverly Nelson could not raise an affirmative defense under the Equal Credit Opportunity Act

---

[6] The Court granted summary judgment on Plaintiffs' affirmative defenses nos. 3, 7-21, 24-25, 27-32, 35-36.

("ECOA").[7] The Court finds the Bank is entitled to summary judgment on the remaining 9 affirmative defenses.[8]

### A. The Bank did not anticipatorily repudiate, repudiate, or otherwise breach the Note or the Loan Agreement.

Plaintiffs' first affirmative defense is that the Bank materially breached the various loan agreements by anticipatorily repudiating them[9] which entitled Plaintiffs to suspend their performance while the Bank's breach remained uncured. Similarly, Plaintiffs' affirmative defenses nos. 22, 23, and 26 argue that the Bank counterclaims are barred by, or a set off should be granted for any damages, because (1) the Bank's initially repudiated the agreements; (2) the Bank made assertions which gave Plaintiffs reasonable grounds to believe the Bank would breach the agreements; and/or (3) the Bank actually breached the agreements.

The factual predicate for all these defenses is that the Bank agreed[10] to loan *at least* $7.95 million to Smithville 169, and that "[d]espite the express terms of the Note and the Construction Loan Agreement, the Bank unilaterally decided in 2010 and 2011 that it would not disburse the entire $7.95 million promised under the loan documents." (Doc. 114 at 30.) Plaintiffs also claim that the Bank refused to honor some draw requests because the loan-to-value ration for the project exceeded 80%.

---

[7] Thus, the Court granted the Bank summary judgment on Plaintiffs' affirmative defense no. 34.
[8] Affirmative defenses nos. 1-2, 4-6, 22-23, 26, 33.
[9] Missouri recognizes the doctrine of anticipatory breach by repudiation. *Ewing v. Miller*, 335 S.W.2d 154, 158 (Mo. 1960). Under that doctrine, "[a] party to a contract repudiates that contract by manifesting, by words or conduct, a positive intention not to perform." *Carmel v. Dieckmann*, 617 S.W.2d 459, 460 (Mo. Ct. App. 1981).
[10] The specific language used by Plaintiffs is that the loan documents executed by the parties "expressly contemplate that the Bank would disburse loan proceeds of $7.95 million to Smithville 169, LLC." (Doc. 114 at 30.) By "expressly contemplates," the Court understands Plaintiffs to mean agreed. If by "contemplate" Plaintiffs are suggesting in any way that the parties did not have an explicit written agreement, or that some of the terms of the parties' agreement had not been reduced to writing, then the Court would grant the Bank summary judgment on Plaintiffs' affirmative defense. The Court would do so because (1) the record is clear that the parties had an explicit, clear written agreement; and (2) any attempt by Plaintiffs to rely on any alleged oral agreements is barred by Missouri's Credit Agreement Statute of Frauds, Mo. Rev. Stat. § 432.047, which eliminates all claims and *defenses* relating to a credit agreement if that agreement is not in writing. *BancorpSouth Bank v. Paramont Prop., L.L.C.*, 349 S.W.3d 267-68 (Mo. Ct. App. 2011).

Plaintiffs' first argument ignores the plain language of the loan documents. The $7.95 million referenced in the Note and the Loan Agreement is the *maximum* the Bank agreed to loan, and nothing in the loan documents *obligated* the Bank to disburse this amount. On the contrary, the Loan Agreement states the Bank will lend "a sum not to exceed" $7.95 million, and the Note recites that Smithville 169 will be obligated to repay $7.95 million "or such amount as is advanced hereunder." These statements clearly evidence that the parties understood the Bank might disburse less than $7.95 million.

The uncontroverted facts also demonstrate that the Bank never refused any draw requests in violation of the Loan Agreement. The Loan Agreement states that the Bank was not required to make a disbursement if Smithville 169 did not meet certain conditions, such as submitting appropriate supporting documentation or if Smithville 169 was already in default on the loan. The uncontroverted facts show that while the Bank occasionally required Plaintiffs to submit additional documentation before approving a request, the only time the Bank declined to make a disbursement was when the loan was already in default.

Thus, the Court holds the Bank did not anticipatorily repudiate the Loan Agreement, repudiate the Loan Agreement, give Plaintiffs reason to believe it would breach the Loan Agreement, or otherwise breach the Loan Agreement. Accordingly, the Bank is entitled to summary judgment on Plaintiffs' affirmative defenses nos. 1, 22, 23, and 26.

**B. The Guaranties are not ambiguous.**

Plaintiffs' second affirmative defense alleges that the Bank's counterclaims are barred because "the Loan Documents are ambiguous both on their face and when viewed along with the other Loan Documents . . ." (Doc. 52 at ¶ 198.) Similarly, Defendant's fourth affirmative defense is that "the Guaranties are ambiguous on their face . . . regarding who all the Guarantors are, in what order the Guaranties will be collected, how and whether the Guaranties are limited

or unlimited, and who is jointly and severally liable." (Doc. 52 at ¶ 212.) These allegations closely mirror those in Count IV of Plaintiff's Petition which seeks a declaratory judgment that the Guaranties are ambiguous and unenforceable.

Although Plaintiffs appear to have abandoned the former defense by not raising it in their brief opposing the Bank's motion for summary judgment on its counterclaims, they arguably did assert their fourth affirmative defense. Plaintiffs argue the following in their brief:

> . . . the Guaranties are ambiguous on their face and should not be enforced, as alleged in Count IV of Plaintiffs['] Petition. Specifically, waiver provisions in the Guaranties are unenforceable because they do not comply with requirements that waivers be set off in distinctly from the remainder of the document. *See Warren v. Paragon Technologies Group, Inc.*, 950 S.W.2d 844, 845 (Mo. 1997) (exculpatory language must be "clear, unambiguous, unmistakable, and conspicuous.").

(Doc. 139 at 18.)

While these assertions might be enough to survive a motion to dismiss, they are insufficient to survive a motion for summary judgment. A party asserting an affirmative defense at the summary judgment stage bears the burden of demonstrating material facts exist which support the affirmative defense. *See* Fed. R. Civ. P. 56(e); *United States v. Farmers Coop. Co.*, 708 F.2d 352, 352 (8th Cir. 1983). Here Plaintiffs have not set forth any facts or analysis from which the Court could find that the Guaranties are ambiguous.

Whether a contract is ambiguous is a question of law to be decided by the court. *Alack v. Vic Tanny Int'l of Mo., Inc.*, 923 S.W.2d 330, 337 (Mo. banc. 1996). "An ambiguity arises when there is duplicity, indistinctness, or uncertainty in the meaning of the words used in the contract." *Id.* (quotation omitted). "Language that is ambiguous to an unsophisticated party may not be ambiguous to a sophisticated" party. *Purcell Tire & Rubber Co., Inc., v. Exec. Beechcraft, Inc.*, 59 S.W.3d 505, 510 (Mo. banc. 2001). In this case, the Guaranties' waiver

provisions are clearly labeled.[11] Given that Plaintiffs are real estate developers who had their attorney review and negotiate the Guaranties before they were executed, the Court holds the Guaranties, and the waiver provisions in particular, are clear, unambiguous, unmistakable, and conspicuous. Accordingly, there is no merit to Plaintiffs' fourth affirmative defense.

### C. The Bank is not required to collect collateral securing the Note before pursuing any deficiency against the Plaintiffs.

Plaintiffs' fifth affirmative defense is that the Bank's counterclaims "are barred by the agreements between the parties in that the Bank must collect from the collateral securing the Guaranties" (Doc. 52 at ¶ 214). Plaintiffs' thirty-third affirmative defense is similar: "The Bank ha[d] an affirmative duty to foreclose the Deed of Trust and credit bid the fair market value of the property prior to pursuing any alleged deficiency on the Note against the Borrower or the alleged Guarantors" (Doc. 52 at ¶ 322). In these defenses, Plaintiffs contend the Bank had an obligation to foreclose on the real property securing the loan before seeking to collect under the Note or Guaranties.

The express language of the loan documents, however, contradicts these assertions. They state that in the event of a default the Bank would be allowed to elect its remedies. Article IV of the Loan Agreement states:

> 4.4 <u>Remedies Cumulative</u>. *The said rights and remedies of Lender shall be cumulative and not exclusive*, Lender to be privileged and to have the absolute right to resort to any one or more or all of said remedies (including, without limitation all remedies provided Lender in the Deed of Trust or other Loan Documents), none to the exclusion of the others, in the event of any noncured default by Borrower under this Agreement or the Loan Documents. Also Lender may elect in its sole discretion in the event of default to foreclose on personal property securing the Loan under the Uniform Commercial Code or in connection with any foreclosure under the Deed of Trust. . . . The rights and remedies set forth in this ARTICLE IV shall be in addition to and

---

[11] They state: "4. <u>Waivers by Guarantors, Etc.</u> Guarantors hereby waive . . ."

> not to the exclusion of any and all other rights and remedies
> granted to Lender hereunder, under any of the Loan Documents or
> otherwise at law or in equity.

(Emphasis added.) Similarly, section 15 of the Deed of Trust (titled "Non-Waiver; Non-Exclusive Remedies.") explicitly provides that,

> . . . No remedy conferred upon or reserved to the Beneficiary
> herein is intended to be exclusive of any other remedy or remedies,
> and *each and every such remedy shall be cumulative and shall be
> in addition to every remedy given to the Beneficiary or now or
> hereafter existing at law or in equity or by statute*.

(Emphasis added.) Additionally, paragraph four of the Guaranties (captioned "Waivers by Guarantors, Etc.") states that,

> . . . No delay or failure on the part of Lender in the exercise of any
> right or remedy against either Borrower or Guarantors, or any
> other party against whom Lender may have any right, and no
> single or partial exercise by Lender of any right or remedy herein
> shall preclude other or further exercise thereof or the exercise of
> any other right or remedy whether contained herein or in the Note
> or any of the Loan Documents. *The remedies provided herein and
> in any other Loan Document shall be cumulative and not exclusive
> of any remedies provided by law*. . . .

(Emphasis added.) Under Missouri law, a borrower or guarantor may waive any right it may have to require a lender to foreclose on collateral before recovering on a guaranty. *See ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.,* 854 S.W.2d 371, 385 (Mo. *banc* 1993); I *Commerce Bank of St. Louis, N.A. v. Wright*, 645 S.W.2d 17, 21-2 (Mo. Ct. App. 1982). Thus, while the Bank had the option to foreclose on the collateral before pursuing the Guarantors, it was under no obligation to do so. Consequently, the Bank is entitled to summary judgment on these affirmative defenses as a matter of law.

### D. Plaintiffs waived any impairment of collateral defense in their Guaranties.

Plaintiffs' sixth affirmative defense is that the Bank's counterclaims "are barred by the agreements between the parties in that the Bank's actions have impaired the Smithville 169 Parties' rights against the collateral securing the Guaranties and rights of contribution against the Company." (Doc. 52 at ¶ 216.) Again, this defense fails because Plaintiffs expressly waived any impairment of collateral defense. The Guaranties contain the following provisions:

> 4. <u>Waivers by Guarantors, Etc.</u> Guarantors hereby waive . . . (m) any right to claim discharge of the Liabilities on the basis of unjustified impairment of the collateral for the Liabilities;
>
> 6. <u>Liabilities Guaranteed</u>. This Guaranty is made and shall continue as to any and all Liabilities without regard to collateral . . . . Any impairment of any and all such collateral or security . . . if any, shall not in any manner affect of impair the liability of Guarantor.

Consequently, the Bank is entitled to summary judgment on Plaintiffs' sixth affirmative defense.

### III. The Bank is entitled to $7,797,081.17 plus interest and late charges.

The Court holds the Bank is entitled to the outstanding principal balance on the Note of $7,302,558.00, plus $67,526.36 for accrued interest, $365,127.92 for late charges, and $61,868.89 in default interest that had accrued as of August 1, 2011, all of which totals $7,797,081.17, plus any interest and late charges that have accrued since then.

### Conclusion

For the reasons set forth above, Defendant's motion (Doc. 121) is GRANTED and Plaintiffs' motion (Doc. 113) is DENIED. The Court GRANTS Defendant summary judgment on its counterclaims and on Counts I and III of Plaintiffs' claims. The Court holds Defendant is entitled to $7,797,081.17 plus any interest and late charges that have accrued since August 1, 2011.

Defendant shall submit a proposed judgment to the Court on or before February 11, 2013.

Plaintiffs shall file any objections to the proposed judgment on or before February 19, 2013.

**IT IS SO ORDERED.**

Date:   February 5, 2013                             /s/ Greg Kays
                                                     GREG KAYS, JUDGE
                                                     UNITED STATES DISTRICT COURT